IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. CONSTANTINE ZVEREV, AND THE STATE OF CALIFORNIA, STATE OF ILLINOIS, STATE OF MASSACHUSETTS, AND STATE OF NEW YORK, *ex rel.* CONSTANTINE ZVEREV, | ) ) ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 12 CV 8004 |
| USA VEIN CLINICS OF CHICAGO, LLC; USA VEIN CLINICS, LLC; USA VEIN CLINICS OF BOSTON, LLC; USA VEIN CLINICS, P.C.; USA VEIN CLINICS OF NEW YORK, LLC; USA VEIN CLINICS, INC.; and YAN KATSNELSON, AN INDIVIDUAL, | ) ) ) ) ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff-Relator Constantine Zverev brings this qui tam action on behalf of the United States of America and the states of Illinois, California, Massachusetts, and New York under the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(C), Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*, California False Claims Act, Cal. Gov't Code § 12650, *et seq.*, Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 §§ 5A-5O, New York False Claims Act, N.Y. State Fin. Law, §§ 187-194, and the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. 92/1 *et seq.* The crux of Zverev's allegations is that the defendants, his former employers, schemed to defraud Medicare and Medicaid (as well as various other private insurance providers) by billing those providers for medical procedures that were either never performed, performed inadequately, or performed when medically unnecessary. Zverev also

maintains that once it was discovered that he was conducting his own private investigation of these acts, his employment was terminated him in retaliation, and in violation of the Federal False Claims Act, 31 U.S.C. § 3730(h)(1) and the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/20. The defendants move to dismiss Zverev's Second Amended Complaint ("complaint") in its entirety. For the reasons that follow, that motion is granted in part and denied in part.

## BACKGROUND

In addition to Dr. Yan Katsnelson, a cardiovascular surgeon, the complaint names numerous limited liability corporations as defendants in the action. According to the complaint, defendant Dr. Katsnelson either owns or controls the defendant entities in their entirety, and they operate in an integrated and uniform manner in terms of "policies, practices, treatment and billing modalities." Sec. Am. Compl. ("Compl."), ¶ 13, ECF No. 37. Each of the corporate defendants is centrally connected to a common computer system and common databases. For simplicity's sake, the corporate defendants will generally be referred to collectively as "USA Vein" except where noted.

USA Vein provides in-patient endovascular laser therapy ("EVLT") procedures. EVLT is used to treat varicose veins, which are veins that are visibly swollen and twisted. The EVLT procedure entails the insertion of a heated laser fiber into the target vein via a catheter. The physician then gradually increases the fiber's temperature until reaching the required temperature. The fiber is then removed, which collapses the vein and shut off circulation through it. The vein then slowly dies off, and blood is diverted through the remaining healthy veins. EVLT can serve both cosmetic and medical purposes; the defendants obtained reimbursement for

medically necessary EVLT procedures rendered to patients insured through Medicare, Medicaid, and private insurance plans.

Plaintiff-Relator Constantine Zverev worked out of USA Vein's Northbrook, Illinois clinic as an information technology and data analyst from May 2011 through October 2011. As an analyst, he was responsible for compiling patient data and creating programs that could be used to identify trends in patient populations and the services they requested. In conducting these duties, he claims to have had access to USA Vein's patient data including patient identifying information, dates of service, and details of services provided. The complaint also refers to "billing data spreadsheets" to which Zverev claims he had access (*e.g.*, Compl. ¶ 100).

In reviewing this information, Zverev became suspicious of the defendants' billing practices. He first became concerned when he was copied on an email sent from Cathy Mata, USA Vein's billing manager, to Dr. Katsnelson, Jekaterina Rapaport (USA Vein's insurance manager for Illinois), and Stella Gazaryan (USA Vein's office manager for California). The email stated "I noticed that Dr. Katsnelson is billing in Boston and Chicago in the same date. We should be more careful." *Id.* at ¶ 87. His interest piqued, Zverev began sleuthing through USA Vein "patient databases" (*id*. at ¶ 88) looking for examples of such occurrences. These databases included a patient database and a billing database; the latter, according to the complaint, indicated which insurer was billed for which patient.

According to Zverev, this review revealed that the defendants were billing Medicare for EVLT procedures that could not have possibly been completed on the dates that the defendants represented in the bills. He points, for example, to records indicating that on October 12, 2009 Dr. Katnelson performed eight EVLT procedures on eight different patients in Chicago, while on the same day he also apparently conducted five initial patient visits in Boston. At least six of

these patients were billed for the defendants' services through Medicare. These same records allegedly indicate that on March 22, 2010—in a single day—Katsnelson performed nineteen patient visits in Chicago, eight in New York, and fourteen in Boston. Zverev maintains that at least thirty-one of these forty patients were insured through Medicare or Medicaid, and that Medicare or Medicaid was subsequently billed for those procedures. Similarly, records indicate that on March 23, 2010 Dr. Katsnelson billed for nine patient visits in Chicago, two in New York, and twenty in Boston. At least twenty-six of these thirty-one patients were billed through Medicare or Medicaid. Assuming an hour per procedure, Zverev concluded that the defendants were billing more procedures than Katsnelson possibly could have completed and so must have been engaged in a scheme to defraud insurance providers, including Medicare and Medicaid, by billing for services that were never rendered. Zverev's suspicions were further bolstered by a conversation that Zverev allegedly had with another one the defendants' employees, Dr. Melkonyan. Melkonyan told Zverev that he had been asked by Dr. Katnelson to sign off on several altered and backdated patient bills, which reflected charges for services which he (Melkonyan) had never actually performed. Shortly after this conversation, Dr. Melkonyan left his job with USA Vein.

In addition, Zverev maintains that the defendants also billed insurance providers for "services inadequately rendered." *Id.* ¶¶ 82, 110, 113-116. More specifically, Zverev alleges that Katsnelson and other doctors at USA Vein reused what were supposed to be single use laser fibers when performing EVLT procedures, while billing Medicare and Medicaid for new fibers in connection with each procedure. The complaint alleges that several doctors and technicians who worked, or formerly worked, at several USA Vein locations told Zverev that Dr. Katsnelson directed them to sterilize and reuse single-use fibers, and that Zverev had personally observed

4

fibers soaking in a sterilization fluid even though they were only supposed to be used once. He claimed that the defendants then "billed Medicare, Medicaid and private insurers, as if the procedure were properly conducted using new instruments." *Id.* at ¶ 84.

Finally, Zverev also alleges that his investigation revealed that the defendants were billing insurance providers for "medically unnecessary" services because USA Vein ultrasound technicians recommended EVLT procedures as medically necessary "at a significantly higher rate than would be expected." *Id.* at ¶ 124. He maintains that this occurred because Dr. Katsnelson ordered ultrasound technicians to make as many "positive diagnosis" as possible, even in cases where no procedure was medically necessary, in order to increase the number of claims that could be submitted to the government. *Id.* at ¶ 127. Other physicians allegedly told Zverev that Dr. Katsnelson ordered them to perform EVLT procedures on the same vein multiple times within a period of two months without a determination of medical necessity. These same physicians told Zverev that Dr. Katsnelson then ordered them to indicate on Medicare and Medicaid submissions for reimbursement that the procedures were medically required, even though they did not believe that was the case.

Zverev alleges that in October 2011 Dr. Katsnelson became aware that Zverez was investigating the defendants' billing practices. Zverev believes that Dr. Katsnelson became aware of his investigation by having a family member monitor Zverev's computer activities. Subsequently, on October 22, 2011, a Saturday, Katsnelson unexpectedly approached Zverev at a local restaurant and demanded that Zverev turn over his work laptop immediately. Zverev complied. Later that evening, Katsnelson called Zverev and demanded the password for that same laptop. According to Zverev, Katsnelson told Zverev that if he did not give the password to

him that he would call the police, so Zverev provided the password to Katsnelson. A few hours later, Katsnelson sent an email to Zverev stating that Zverev was fired.

## DISCUSSION

Defendants move to dismiss the complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that Zverev's fraud claims lack the particularity required by Rule 9(b), and that his retaliation claims are unsupported by any allegations of fact.[1] When analyzing the sufficiency of a complaint, the court construes it in the light most favorable to the plaintiff, accepting well-pleaded (that is, non-conclusory) facts as true, and drawing all reasonable inferences in the plaintiff's favor. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). Under Federal Rule of Civil Procedure 8, a complaint can withstand a motion to dismiss only if it alleges enough facts to render the claims facially plausible, not just conceivable. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, under Rule 9(b) of the Federal Rules of Civil Procedure, applicable to Zverev's claims that defendants were engaged in fraudulent billing practices (Counts I-III and V-IX), a party who alleges fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.* 631 F.3d 436, 441 (7th Cir. 2011). "The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless. It also forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims." *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*,

---

[1] The complaint also includes a common law conspiracy claim (Count III), but Zverev voluntarily dismissed that claim without prejudice in his response to the motion. *See* Pl.'s Resp, n. 1, ECF No. 50. Accordingly, it is not addressed in this opinion.

412 F.3d 745, 749 (7th Cir. 2005). For purposes of Rule 9(b), particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

### A. Application of Rule 9(b) to the FCA Claims

Counts I and II of the Second Amended Complaint rely on sections 3729(a)(1)(A) and (B) of the FCA, which require Zverev to allege that (1) defendants submitted a claim or statement to the government; (2) for the purposes of obtaining money; (3) knowing that the claim or statement was false. 31 U.S.C. § 3729(a)(1)(A)-(B). The various state laws cited by Zverev that prohibit the submission of false claims require the pleading of the same elements as the FCA.[2] The defendants argue that Zverev has failed to satisfy Rule 9(b) not because the complaint is not sufficiently detailed as to any of the three schemes it describes (billing for EVLT procedures not performed; billing for laser fibers that were reused; and performing EVLT procedures that were medically unnecessary), but rather because the complaint lacks particularized information concerning any alleged false claim actually submitted to the government. Defs.' Mot. 9, ECF No. 40. In other words, the defendants assert that Zverev has failed to allege specific facts indicating that the defendants submitted a false claim or statement to the government—the threshold element of any FCA claim. Def's Mot. 8, ECF No. 40 ("Relator must identify the time, place, and content of the alleged false claims, and the method by which the alleged false claims were communicated.").

---

[2] See California False Claims Act, Cal. Gov't Code § 12650, *et seq.*; Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 §§ 5A-5O; New York False Claims Act, N.Y. State Fin. Law, §§ 187-194; Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. 92/1 *et seq.* Federal pleading standards, including Rule 9(b), apply to these state law claims when brought in federal court. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 n.5 (7th Cir. 2015); *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999).

Here, with the addition of the information included in Exhibit A to his response brief, the court concludes that Zverev has pled with sufficient particularity that the defendants engaged in a fraud scheme that included the submission of bills to Medicare and Medicaid for EVLT procedures that were not performed. The court agrees, however, that the complaint fails to allege adequately that false billings were submitted with respect to the other schemes alleged.

### 1. The Alleged Scheme to Bill for EVLT Procedures Not Performed

With respect to the alleged scheme to bill for EVLT procedures that were not performed, Zverev's claim is clear, plausible, and particularized. He charges that Katsnelson, through the USA Vein entities he controlled, billed Medicare and Medicaid for procedures that he did not perform. The claim is plausible because it alleges that Katsnelson billed the government and private insurers for large numbers of procedures supposedly performed in up to three different, geographically remote cities in a single day; there are, so the saying goes, only so many hours in a day, and the complaint reasonably contends that Katsnelson could not have done all the work he claims to have done without the ability to teleport himself between Chicago, New York, Boston, and other geographically dispersed locations where he allegedly performed EVLT procedures on the same day.[3] And the claim is sufficiently particularized because Zverev has, in the complaint and Exhibit A, provided detailed information about the dates when Katsnelson billed these seemingly impossible numbers of procedures, which procedures were billed to the government, and when they were billed.[4]

---

[3] The plausibility of the claim is also buttressed by allegations that a doctor employed by USA Vein told Zverev that Katsnelson had asked him to sign off on altered and backdated patient bills for services that the doctor had not provided. Compl. ¶ 101.

[4] The defendants argue in their reply brief that Zverev "has not alleged any particularized facts, let alone cited specific examples, describing procedures that were not performed," claiming that he has not provided "the dates of services, the names of the physician who treated

To illustrate with just one example, on October 12, 2009, the complaint alleges that Dr. Katnelson performed eight EVLT procedures on eight different patients in Chicago, while on the same day he also conducted five procedures in Boston. As supplemented by Exhibit A, the story is even more interesting; according to that summary, Katsnelson performed 14 EVLT procedures in Chicago and seven in Boston. If, as Zverev alleges, each EVLT procedure takes about an hour, Katsnelson could not have performed all of the procedures reflected in the records while also traveling from Chicago to Boston (or vice versa). Further supplementing the allegations of the complaint, Exhibit A also shows that 12 of the 21 procedures Katsnelson is recorded as having performed were billed to Medicare.

It is true enough that the complaint's allegations do not identify the specific EVLT procedures that were performed on October 12, 2009, and those that were not. The same holds true for all the other dates identified on which Katsnelson is alleged to have performed an impossible number of procedures. The defendants argue, therefore, that the complaint fails to include the requisite degree of particularity because it does not identify specific claims for payment that were false; at most, the information Zverev has set forth shows that some procedures billed to the indicated insurer that day (whether Medicare or a private insurer) were not performed. This argument finds some support in Seventh Circuit cases like *United States ex rel. Grenadyor v. Ukrainian Village Pharm., Inc.*, 772 F.3d 1102 (7th Cir. 2014), in which the panel held that the FCA complaints failed to satisfy Rule 9(b)'s heightened pleading requirements because the relator failed to identify with specificity even a single false claim

---

the patient, the codes used in billing, and an explanation for why the codes billed were not appropriate." Reply at 4, ECF 52. But Exhibit A provides that data and more. It presents: the date and location of the EVLT procedures; patient identification information; the billing codes submitted; the dates on which the procedures were billed; and the insurer that was billed for the procedure.

submitted to the government despite having adequately alleged that the defendant pharmacy had provided kickbacks to customers. Notwithstanding the kickback scheme, the court dismissed the claim in light of his failure "to allege either that the pharmacy submitted a claim to Medicare (or Medicaid) on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback . . . ." 772 F.3d at 1107. Similarly, in *Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005), the Seventh Circuit affirmed the dismissal of FCA claims because the plaintiff failed to allege particularized details about allegedly false certifications that had been submitted by the defendants to obtain payments from the government.

But Zverev has done more here than did the relators in *Grenadyor* and *Gross*. He has adequately alleged facts that show that some number of the claims USA Vein billed on specific days were fraudulent and that Medicare and Medicaid were billed for a substantial portion of the procedures on those days. Does this mean that USA Vein necessarily submitted false bills to the government? No. Does it plausibly allege that the government was defrauded by the submission of one or more identifiable claims submitted for reimbursement of particular services purportedly performed on specific days? Yes, and as the Seventh Circuit recently confirmed in *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777 (7th Cir. 2016), this Circuit's "case law establishes that a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government." Rather, what Rule 9(b) requires in this context is simply allegations that permit the reasonable inference that the defendant presented false claims to the government. *Id*. at 778. *See also United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 870 (7th Cir. 2011) ("A relator need not have seen the claims submitted to the federal government . . . but must know enough to make fraud a

likely explanation for any overbilling"); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854-55 (7th Cir. 2009) ("It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy."). Thus, while in *Lusby* the Court acknowledged that "it is essential to show a false statement," it did not demand allegations that identified a specific false statement; it was enough there that the relator's allegations identified the type of false statement and permitted the inference that "at least one such certificate" had been submitted to the government. 570 F.3d at 854. *See also, e.g., Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 839 (7th Cir. 2013) (no identification of specific certification, but inferring that a certification must have been submitted because the defendant could not otherwise have obtained its funding from the government). Zverev's allegations satisfy this standard.

The court does not read *Grenadyor* or *Gross* to be inconsistent with *Presser*'s reiteration that a relator need not "include allegations about, a specific document or bill that the defendants submitted to the Government." 836 F.3d at 777.[5] In *Grenadyor*, the problem was not so much the failure to identify a specific kickback recipient as it was the failure to allege facts that plausibly established that ***anyone*** received a kickback; the failure to identify a specific kickback recipient was a symptom of the larger problem. *E.g.*, 772 F.3d at 1107 (complaint lacked particularity because it failed "to identify a single patient who received [a kickback] over the course of the year"). And in *Gross*, the problem was not the failure to identify submissions to the government, but rather the failure to describe how those submissions constituted false statements to obtain payments. 415 F.3d at 605. That is not a problem here, where the false submissions are alleged to

---

[5] The Court notes as well that Judge Posner was on the panel in *Lusby, Grenadyor,* and *Gross,* but apparently found no material inconsistency between their holdings concerning the necessity of identifying specific claims for payment.

be fraudulent invoices for the provision of medical services. The court therefore concludes that Zverev's complaint satisfies Rule 9(b)'s requirements for pleading the submission of false claims to the government. To the extent that the defendants maintain that Zverev is required to allege the details about specific bills submitted to the government for reimbursement, there is no such requirement.

It also bears noting that the Seventh Circuit has held repeatedly that "the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Corley v. Rosewood Care Ctr., Inc*., 142 F.3d 1041, 1051 (7th Cir. 1998); *see also Presser*, 836 F.3d at 778 (quoting *Corley* on this point). While Zverev claims to have had access to records sufficient to plausibly show that USA Vein billed the government for procedures that were not performed, he does not claim to have had access to all records necessary to detail false bills submitted and, in any event, his access to any records was terminated when he was fired. What he has produced, thus far, is enough to justify going forward with discovery. As stated in *Lusby*, it is enough for a complaint alleging a violation of the FCA to include allegations that "show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." 570 F.3d at 854-55. Zverev's claim regarding the billing of EVLT procedures is not the sort of unsupported claim of fraud that Rule 9(b) protects against and it will work no injustice on the defendants to permit the claim to go forward to discovery. The complaint includes enough detail to put the defendants on notice of "what the fraud entails," *Lusby,* 570 F.3d at 855, and to allow them to contest the allegations about that scheme effectively—evidence permitting.

The defendants also object that, in any event, the alleged scheme to bill for EVLT procedures not performed does not plausibly establish that the defendants submitted claims for

12

procedures that Katsnelson did not perform because it rests entirely on Zverev's unsupported claim that an EVLT procedure typically takes about an hour. It is true that Zverev does not explain on what that estimate is based, but it is enough at the pleading stage to note that Zverev's allegation is not inherently implausible (Zverev worked for USA Vein for about six months, had access to areas where the procedures were performed, and interacted with employees involved in conducting the procedures; it is plausible, then, that he would have some general understanding of how long a typical EVLT procedure would take) and that in ruling on a motion to dismiss, the court is required to accept the truth of the defendant's fact allegations. If, indeed, Katsnelson is able to perform such procedures more quickly due to his skills and experience, the force of Zverev's claim will be diminished proportionally, but that is quintessentially a question of fact that cannot be resolved against Zverev at this juncture. Taking language out of context, the defendants point to *Presser*'s dismissal of an FCA claim based on the relator's "personal estimation," 836 F.3d at 780, but the *Presser* court was addressing not a simple estimate of the typical length of an event—a seemingly straightforward task within the ken of a layperson with some basis of familiarity with the event—but an unsupported opinion about the medical necessity of certain procedures that were offered by the relator, who had none of the professional qualifications or specific information necessary to offer such an opinion. Here, the allegation is one of fact, and the court is required to assume, at this juncture, that it is true.[6]

---

[6] Given the degree to which the allegations about this fraud scheme are predicated on Zverev's estimate, this promises to be a significant fact dispute in the case. The court notes, for example, that the materials from the USA Vein website that Zverev included with the complaint state that the EVLT procedure is "quick," and that most treatments take less than 15 minutes. See Compl. Ex. F at pg.2. This claim by USA Vein doesn't trump Zverev's allegation at this juncture (as marketing materials, the accuracy of this estimate is also open to question), but it highlights the materiality of the dispute between the parties on this issue. If a typical procedure takes 15

### 2. The Alleged Scheme to Bill for Medically Unnecessary EVLT Procedures

Zverev's allegations regarding false billings to Medicare and Medicaid for medically unnecessary EVLT procedures, by contrast, fall short of plausibly alleging, with the requisite particularity, that the defendants billed the government for procedures that were not medically necessary. These allegations rest on Zverev's claim that "USA Vein ultrasound technicians recommended a 'positive diagnoses,' [sic] indicating a need for surgery, at a significantly higher rate than would be expected." The complaint includes allegations that certain technicians employed by USA Vein in Illinois (where Katsnelson primarily worked) recommended as surgery as medically necessary in a very high percentage of the patients for which they performed ultrasounds (in some cases, almost 100%), that several doctors employed by USA Vein told Zverev that Katsnelson had directed them to perform unnecessary procedures on the same veins (and that they had complied with those orders), and that USA Vein physicians were financially incentivized to perform as many procedures as possible. While these allegations may plausibly suggest that USA Vein billed some provider for some unnecessary procedures on some dates,[7] they provide no basis to identify, with any degree of particularity, which bills were fraudulent on that basis. In marked contrast to the data provided to identify false billings for EVLT procedures that were not performed, the complaint provides no similar data from which the defendants could even begin to identify which claims were alleged to be fraudulent due to lack of medical necessity. Zverev provides no information, for example, about bills submitted for

---

minutes rather than 60, the seemingly impossible number of procedures Katsnelson performed on certain days becomes much more feasible and, so, much less probative of fraud.

[7] What the allegations lack with regard to comparative data regarding typical percentages of EVLT procedures diagnosed as medically necessary it makes up for with allegations that a number of doctors admitted to Zverev that they performed unnecessary procedures. Compl. ¶¶ 128-133.

procedures performed by any of the doctors who are alleged to have admitted to Zverev that the performed and billed for medically unnecessary surgeries. Indeed, the complaint's allegations do not provide a basis to rule out a single bill for EVLT procedures from the scope of this alleged scheme; to defend against this claim on the basis of the allegations presented, the defendants would be required to review the details of every procedure performed. As such, this claim is the antithesis of a claim pled with particularity and, accordingly, it fails. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("A contention that the 'total claims' are false . . . fails the requirement of specificity.").

### 3. The Alleged Scheme to Bill for Reused Laser Fibers

The allegations regarding the alleged scheme to bill the government fraudulently for laser fibers used in EVLT procedures when USA Vein was reusing fibers rather than using new fibers for each procedure are equally wanting, if not more so. With regard to this alleged scheme, Zverev's complaint, supplemented by its response brief and the data presented there in Table 1, includes ample information to plausibly establish that USA Vein reused single-use fibers in its EVLT procedures. The complaint, however, includes no fact allegations that support the conclusory allegation that USA Vein *billed Medicare* for single-use fibers for EVLT procedures in which the laser fibers had been used previously. In contrast to the allegations about billing for medically unnecessary procedures, the complaint includes no allegations that anyone at USA Vein told Zverev that USA Vein was submitting false bills on this basis, and provides no information that would identify any particular fraudulent claims. The claim that USA Vein billed for single-use fibers that were not ordered is based solely on Zverev's conclusion that this is the logical reason that USA Vein would regularly reuse laser fibers; whether that conclusion is

15

reasonable or not, it provides no basis to identify with any particularity any such claims that were submitted. Accordingly, it fails as well.

### 4. The Allegations Against the USA Vein Defendants

The various USA Vein defendants also assert that the complaint fails to allege particular facts as to their participation in any of the alleged schemes to defraud Medicare and Medicaid. The defendants argue that Zverev's complaint "lumps together all of the [d]efendants, without making any effort to distinguish between them or describe their individual involvement in the alleged fraudulent activity." Defs.' Mot. 12. As part of Rule 9(b)'s requirement that the plaintiff plead the "who, what, where, when, and how," the relator must adequately allege each defendants' role in the fraudulent scheme. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992). Simply lumping defendants together because they share a common nomenclature is not enough. *See Sears v. Likens,* 912 F.2d 889, 893 (7th Cir. 1990) (affirming dismissal where "the complaint lump[ed] all the defendants together and [did] not specify who was involved in what activity").

But here, the complaint specifically alleges that Katsnelson controlled each of the USA Vein entities, that the entities were structured and operated as an integrated unit, and that Katsnelson caused the entities to submit fraudulent billing submissions while practicing at each of the USA Vein clinics named in the complaint. For example, Zverev alleges that USA Vein patient data bases revealed Katsnelson billing for EVLT procedures supposedly performed at USA Vein's Chicago location (defendant USA Vein Clinics of Chicago, LLC), its New York location (defendant USA Vein Clinics of New York, LLC), and its Boston location (defendant USA Vein Clinics of Boston, LLC), all on the same day. Sec. Am. Compl. at ¶ 94. The alleged role of each entity, therefore, was the same: to submit claims for EVLT procedures that were not

performed. The complaint adequately alleges that each of the defendant entities was part of the alleged fraudulent scheme, orchestrated by Katsnelson, to bill for more procedures than the defendant clinics actually performed.

### B. Retaliation

With respect to Zverev's retaliation claims (Counts IV and X), the defendants allege that Zverev has failed to allege facts indicating he was terminated for engaging in protected activity. Defs.' Mot., 13. In order to establish a retaliation claim under the FCA, Zverev must plead facts indicating that (1) he took action in order to stop FCA violations; (2) the defendants knew he was engaged in that conduct; and (3) that the defendants terminated him because he was engaged in that conduct. 31 U.S.C. § 3730(h);[8] *Brandon v. Anesthesia & Pain Mgt. Associates, Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002). Rule 9(b)'s particularity requirements do not apply to Zverev's retaliation claims. *Thomas v. EmCare, Inc.*, 4:14-cv-00130, 2015 WL 5022284, *2-3 (S.D. Ind. Aug. 24, 2015) (collecting cases).

Zverev has plausibly alleged that he was terminated in retaliation for his investigation into USA Vein's suspect billing practices. The complaint alleges that USA Vein had the capability to monitor his activities on his company-issued laptop computer, and that Katsnelson assigned a family member to do so during the period he was looking into the billing issues he had discovered. Shortly thereafter, he alleges, Katsnelson and his wife tracked Zverev down at a restaurant during a weekend, demanded the immediate surrender of his computer and disclosure of his password, and terminated him within a few hours of obtaining them. Further, the complaint alleges that Zverev was not violating any company policy concerning use of the

---

[8] As Zverev concedes, he is required to plead essentially the same elements for his state law retaliation claim. *See* , 740 Ill. Comp. Stat. 175/1 *et seq*.

computer (there was, he maintains, no policy that barred him from taking the laptop home each night and his practice in doing so was well known to Katsnelson). This is more than just suspicious timing, as the defendants characterize it; it is action that plausibly suggests that Zverev was terminated not because he had taken his work computer outside the office but because of what Katsnelson found on the computer (*i.e.*, patient and billing data). That suffices for pleading purposes to state a claim that Zverev was terminated not for having his computer outside the workplace but for what he was doing on the computer—namely, investigating his suspicions about Katsnelson's billing practices. If USA Vein terminated Zverev for some other reason, it will have to adduce evidence of that fact during discovery.

\* \* \* \* \*

For the foregoing reasons, the defendants' motion to dismiss the Second Amended Complaint is granted in part and denied in part. The FCA and related state law claims founded on the alleged laser fiber reuse and medically unnecessary EVLT schemes are dismissed without prejudice. The motion is otherwise denied.

Dated: March 27, 2017

John J. Tharp, Jr.
United States District Judge

18