# IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* )<br>CONSTANTINE ZVEREV, and the STATE )<br>OF CALIFORNIA, STATE OF ILLINOIS, )<br>STATE OF MASSACHUSETTS, and STATE )<br>OF NEW YORK, *ex rel.* CONSTANTINE )<br>ZVEREV, )<br>                       Plaintiffs, )<br>                                    )<br>             v. )<br>                                      )<br>USA VEIN CLINICS OF CHICAGO, LLC )<br>USA VEIN CLINICS, LLC; USA VEIN )<br>CLINICS OF BOSTON, LLC; USA VEIN )<br>CLINICS, P.C; USA MEDICAL OF NEW )<br>YORK, LLC; USA VEIN CLINICS, INC.; and )<br>YAN KATSNELSON, AN INDIVIDUAL, )<br>                                      )<br>                     Defendants. )  | Case No. 12 C 8004<br><br>Judge John J. Tharp<br>Magistrate Judge Susan E. Cox |

## THIRD AMENDED COMPLAINT (Proposed)

Plaintiff-Relator Constantine Zverev ("Mr. Zverev" or "Relator"), by his undersigned attorneys, Robin Potter Bolanos, LLC; Wang, Leonard and Condon, P.C., and Halunen Law, and for his Third Amended Complaint against Defendants USA Vein Clinics, LLC; USA Vein Clinics of Chicago, LLC; USA Vein Clinics of Boston, LLC; USA Medical of New York, LLC; USA Vein Clinics, P.C; USA Vein Clinics, Inc.; and Yan Katsnelson (collectively, "Defendants") and on behalf of the United States of America, and the States of Illinois, California, New York, and Massachusetts, states as follows:[1]

---

[1] Pursuant to this Court's Memorandum Opinion of March 27, 2017 (Dkt. 61), claims relating to reuse fibers and medical necessity were dismissed without prejudice. Leave to amend was denied. (Dkt. 124). Plaintiff retains the dismissed claims insofar as they relate to the remaining claims, and also in an abundance of caution, to preserve for error and to prevent waiver.

**NATURE OF THE CASE**

1. This is an action brought under the federal False Claims Act, 31 U.S.C. §3729, *et seq*. (the "FCA" or "False Claims Act"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), and the Patient Protection and Affordable Care Act of 2010; the California False Claims Act, Cal. Gov't Code § 12651 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat.175/1 *et seq.* ("IWPCA")*;* the Illinois Whistleblower Act, 740 ILCS 174/1, *et seq.* ("IWA"); the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/15(a) ("ICFPA")*;* the Massachusetts False Claims Act, Mass. Ann. Laws cb.12, § S(A)-(0); and the New York False Claims Act, N.Y. State Fin. Law §187 *et seq.*, to recover damages and civil penalties from Defendants on behalf of the United States of America and the States (Collectively "the Government"), and Private Insurers.

2. Over 70% of federal FCA actions are brought by whistleblowers such as Mr. Zverev. The United States has recovered almost $40 billion in suits brought under the FCA between 1987-2013, and almost $30 billion of those funds were derived from Qui Tam actions brought by relators. Over $6 billion was recovered for the government treasury in fiscal year 2014 alone. http://www.justice.gov/sites/default/files/civil/legacy/2013/12/26/C-FRAUDS_FCAStatistics.pdf

3. Pursuant to 31 U.S.C. § 3730(b)(2), Mr. Zverev provided the Government with the Complaint and a written disclosure of substantially all material evidence in his possession.

**INTRODUCTION**

4. Between 2009 through 2012 each Defendant has intentionally and knowingly billed and submitted, or caused to be billed and submitted, false claims to Medicare, Medicaid

and private insurers. As set forth below, Defendants' actions and/or omissions include, but are not limited to:

- Billing for treatments, procedures, and services that were never rendered, including for services allegedly performed in two or more distant cities on the same day;
- Submitting requests for reimbursement of treatments, procedures and services provided by intentional misuse of medical instruments that reduced the effectiveness of the treatment and put the patients at risk;
- Billing for treatments, procedures and services that were not medically necessary; and
- Solicitation of, and billing for, medically unnecessary follow-up procedures.

5.     The federal FCA, each of the State False Claims Acts (hereafter collectively referred to as the "False Claims Act") and the ICFPA prohibit knowingly presenting, or causing to be presented, to the Government or private insurers, a false or fraudulent claim for payment or approval. The False Claims Act and ICFPA prohibit knowingly making or using a false or fraudulent record or statement to get a false or fraudulent claim paid or approved by the Government or private insurer. Any person who violates the False Claims Act or ICFPA is liable for civil penalties between $5,500 and $11,000 for each claim, plus three times the amount of the damages sustained by the Government.

6.     The False Claims Act and the ICFPA allow any person having information about false or fraudulent claims to bring an action on behalf of the Government. Mr. Zverev is an original source of the information alleged herein, pursuant to the False Claims Act, 31 U.S.C. § 3730(e)(4)(b); California False Claims Act, Cal. Gov't Code § 12652(d)(3); Illinois False Claims Act, 740 ILCS 175/4(e)(4)(b); Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 §5A; and the New York False Claims Act, N.Y. State Fin. Law § 188(7) and has provided that information to the Government in advance of filing this action.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(b)(1) and 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §§ 3732(a) and 3730(b) and because they transacted business within this district and have committed acts within the district that violated 31 U.S.C. § 3729.

9.     Venue is proper in this Court pursuant to 31 U.S.C. §§ 3732(a), 28 U.S.C. §§ 1391 and 1395(a) because at all times relevant to this Complaint Defendants regularly conducted business within this district and maintained employees and/or offices within this District.   In addition, statutory violations alleged herein occurred in the Northern District of Illinois.

## PARTIES

10.     Mr. Zverev is an Illinois resident.  He was employed by Defendants from May 2011 through October 2011 as an information technology and data analyst.

11.     As a USA Vein Clinic IT analyst, Mr. Zverev compiled patient data and created programs to identify trends in patient populations and services provided.   Mr. Zverev had access to patient data, including patient information, dates of service, and details of services provided.

12.     Mr. Zverev's office space was located in the main USA Vein office building in Northbrook, Illinois, which provided him an opportunity to observe and interact with defendants as well as USA Vein physicians and staff.

13.     Defendants operate as integrated corporate enterprises and clinics owned and/or controlled by defendant Katsnelson.  Each clinic operates uniformly in terms of its policies,

practices, and treatment and billing modalities. Each clinic is centrally connected to one unitary computer system and various operational databases.

14. Defendants treat venous insufficiencies by way of Endovenous Laser Therapy ("EVLT"), also referred to as ablation therapy, to treat varicose veins, and also provide other vein related procedures and services, such as microphlebectomy, new patient evaluations, diagnostics, and post-procedure follow-up visits.

15. The EVLT procedure consists of a catheter bearing a laser fiber being inserted, for example, into the large main saphenous vein through a small puncture just above the knee, and injected into the targeted vein. The laser is heated up and removed while the laser causes the vein to collapse and shut. Over the course of several days the collapsed vein dies off and blood begins to travel through the remaining healthy veins.

16. Defendants generate millions of dollars annually for EVLT and other vascular procedures allegedly performed.

17. Defendants concentrate their advertisements and treatments on vulnerable elderly and Eastern European populations.

18. As set forth below, Medicare, Medicaid and private carriers reimburse treaters for medically necessary treatment of venous insufficiency, which generally excludes treatment for cosmetic purposes.

19. USA Vein Clinics of Chicago LLC has sought and obtained reimbursements from Medicare, Medicaid and private carriers for services provided to patients.

20. USA Vein Clinics of Chicago, LLC, is an Illinois limited liability corporation located at 4141 Dundee Road, Northbrook, Illinois, and formed in 2009. Defendant Yan Katsnelson is the only member of the corporation and a 1% owner. 99% of the company is

owned by Chicago Vein Clinic S.C., of which Katsnelson is the sole owner. The corporation has no publicly held affiliates. **See Exh. A, Corporate Information, attached hereto** and Defts'. Corp. Disclosure, Dkt. 23, ¶1. It is a medical clinic that provides outpatient health care services to treat venous insufficiency, a condition affecting the ability of veins to send blood from the legs to the heart, commonly known as and referred to herein as venous insufficiency.

21.     USA Vein Clinics, LLC, is an Illinois limited liability corporation located at 4141 Dundee Rd, Northbrook, Illinois, and formed in 2006.  Defendant Yan Katsnelson is the only member of the corporation. It is 100% owned by FY Growth Fund LP. **See Exh. C, Corporate Information, attached hereto**.  See also, Defts'. Corp. Disclosure, Dkt. 23, ¶2.  It is a medical clinic that provides health care service to treat venous insufficiency.

22.     USA Vein Clinics of Chicago LLC has sought and obtained reimbursements from Medicare, Medicaid and private carriers for services provided to patients.

23.     USA Vein Clinics of Boston, LLC, is a Massachusetts limited liability corporation located at 1208B VFW Parkway, Suite 300, West Roxbury, and Massachusetts and formed in 2009.  It is 99% owned by USA Vein Clinics, PC, and 1% owned by Katsnelson, its registered agent**. See Exh. D, Corporate Information, attached hereto** and Defts'. Corp. Disclosure, Dkt. 23, ¶3. Defendant Yan Katsnelson is the Manager and of the corporation, along with USA Vein Clinics PC. It is a medical clinic that provides health care service to treat venous insufficiency.

24.     USA Vein Clinics of Boston has sought and obtained reimbursements from Medicare, Medicaid and private carriers for services provided to patients.

25.     USA Vein Clinics, PC, is a Massachusetts professional corporation located at 1208 B VFW Parkway, Suite 300, West Roxbury, MA., and formed in 2008. Defendant Yan Katsnelson is the president, treasurer, secretary, 100% owner and director of the corporation.  **See**

**Exh E, Corporate Information, attached hereto.**  Defts'. Corp. Disclosure, Dkt. 23, ¶4. It is a medical clinic that provides health care service to treat venous insufficiency.

26.     USA Vein Clinics, P.C., has sought and obtained reimbursements from Medicare, Medicaid and private carriers for services provided to patients.

27.     USA Medical of New York, LLC, is not registered as a New York corporation but provides health care services to treat varicose veins in New York at 2511 Ocean Avenue, Ste. 102, Brooklyn, New York.   It is 99% owned by Katsnelson's spouse Flora. Defts'. Corp. Disclosure, Dkt. 23, ¶5.

28.     USA Medical of New York has sought and obtained reimbursements from Medicare, Medicaid and private carriers for services provided to patients.

29.     USA Vein Clinics, Inc. is a California corporation located at 5716 Lindenhurst Ave., Los Angeles, California and formed in 2009.  It is 100% owned by Katsnelson's spouse Flora.  **See Exh. B, Corporate Information, attached hereto**.  Defts'. Corp. Disclosure, Dkt. 23, ¶6.  It is a medical clinic that provides health care service to treat venous insufficiency.  USA Vein Clinics, Inc. has sought and obtained reimbursements from Medicare and Medicaid for services provided to patients.

30.     Yan Katsnelson (Dr. Katsnelson) is an Illinois resident.  He is a cardiovascular surgeon licensed to practice medicine in Illinois, Massachusetts and New York.  Dr. Katsnelson is the founder of each of the six Defendant USA Vein Clinic entities (collectively "USA Vein") and manages the day-to-day operations and determines the policies and practices of each entity.

31.     Dr. Katsnelson directs the physicians, treaters and staff of defendants at each of the locations, including to perform the practices complained of herein.

32.     As part of that management, Dr. Katsnelson is responsible for all submissions for payment on behalf of each USA Vein entity to the Government.

## THE FALSE CLAIMS ACT

33.     The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009).[2] In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).

34.     The FCA further prohibits knowingly concealing or knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property back to the federal government.  31 U.S.C. § 3729(A)(1)(G).

35.     The term "knowingly" as used in the FCA means that a person, with respect to information, (I) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).  No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  *Id.*

36.     31 U.S.C. § 3730(h), the anti-retaliation provision of the False Claims Act, provides in relevant part,

---

[2] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009, making certain amendments retroactive, including the prohibitions set forth in 31 U.S.C. § 3729(a)(1)(B).

(1)     Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2)     Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

37.     Any person who violates the False Claims Act or ICFPA is liable for civil penalties between $5,500 and $11,000 for each claim, plus three times the amount of the damages sustained by the Government.  31 U.S.C. § 3729(a).

## THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT

38.     The Illinois Insurance Claims Fraud Prevention Act ("ICFPA"), 740 ILCS 92/1 et seq., provides that [a] person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 [720 ILCS 5/46] shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,500 nor more than $11,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.  740 ILCS 92/5(b).Pursuant to 720 ILCS § 5/46-1 of the Illinois Criminal Code, a person  commits the offense of insurance fraud when he or she:

> [k]nowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim to a self-insured entity permanently of the use and benefit of that property.

720 ILCS 5/46-1(a)

39.     Article 46 of the Criminal Code of 1961, 720 ILCS 5/46, also defines "false claim" broadly as:

> [A]ny statement made to any insurer purported insurer, servicing corporation, insurance broker, or insurance agent, or any agent or employee of the entities, and made as part of; or in support of, a claim for payment or other benefit under a policy of insurance ... when the statement contains any false, incomplete, or misleading information concerning any fact or thing material to the claim

720 ILCS 5/46-1(d)(5).

40.     The ICFPA's *qui tam* provision, 740 ILCS 92/15, provides that any interested person may bring a civil action, in the name of the State of Illinois, for violations of 740 ILCS 92/1 et seq., and by incorporation, 720 ILCS 5/46-1.

## REIMBURSEMENT AND CONTROLLING PROVISIONS FOR ENDOVENOUS LASER THERAPY

41.     The United States, through the Department of Health and Human Services (HHS), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. § 1395j-1395w ("Medicare Part B Program").  The objective of the Medicare program is to provide medical insurance for covered services to any person 65 years or older, and to individuals who are disabled or afflicted with chronic renal disease. HHS has delegated the administration of the Medicare Program to its component agency, the Centers for Medicare and Medicaid Services ("CMS").

42.     In 1965, the federal government enacted the Medicaid program as a cooperative undertaking to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. §§ 1396a(a)-(b). The individual states pay doctors, hospitals,

10

pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation ("FFP").

43.     Pursuant to the FFP, the federal government finances the Medicaid program, and as such, a false claim made to Medicaid is a false claim made to the United States.

44.     As a prerequisite to enrollment as a provider in the Medicaid Program, treaters are required to enter into provider agreements and must agree to comply with federal and state provider participation requirements as a condition of receiving federal and state funding. 42 U.S.C. § 1396a(w).

45.     Part B of the Medicare Program is a 100% federally subsidized health insurance system to provide medical treatment and physician services for disabled persons or persons who are 65 or older. An enrolled individual who obtains a covered medical service can either pay for the medical service himself, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the physician providing the service, who collects as an assignee of the beneficiary under 42 U.S.C. § 1395(b)(3)(B)(ii). The funds to reimburse claims for reimbursement originate from the federal Medicare Trust Fund.

46.     Medical treatment and services by physicians that are reimbursable under the Medicare Part B and Medicaid Programs must be reasonable and medically necessary. The physician or entity seeking reimbursement, including defendants herein, must meet certain obligations to participate as a Medicare provider, including the following duties to:

11

a. Bill for only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A);

b. Not make false statements or misrepresentations of material facts concerning requests for payment. 42 U.S.C. § 1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a;

c. Provide economical medical services, and then, only where medically necessary. 42 U.S.C. § 1320c-5(a)(1);

d. Provide evidence that the service given is medically necessary. 42 U.S.C. § 1320c-5(a)(3);

e. Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. § 1320a-7(b)(6) & (8);

f. Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. § 1320a-7(b)(6)(A);

g. Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B).

47. Medicare and Medicaid specifically exclude from reimbursement "any expense incurred for items or services where such expenses are for cosmetic surgery or are incurred in connection therewith." 42 U.S.C. § 1395y(a)(10).

48. Reimbursement for Medicare claims is made by the United States through CMS. CMS contractually assigns the task of processing and paying Part B claims from the Medicare Trust Fund to private medicare administrative contractors ("MACs") (formerly denoted fiscal intermediaries ("FIs")) under 42 U.S.C. § 1395u.

49. To bill the government and private carriers, Defendants must actually render the services for which they bill.

50. It is a violation of the FCA and the ICFPA to bill Medicare or private carriers for services or treatments that are not medically necessary or not performed. 31 U.S.C. § 3729.

51.    As a condition of participation in billing private and government carriers, defendants' submissions of bills include certifications of medical necessity and billing for services rendered.

52.    At all times relevant to this Complaint, CMS administered the Medicare Part B Program in Illinois, California, New York and Massachusetts through private MACs or FIs. The FIs reviewed and approved claims submitted for medical reimbursement by Medicare providers, including claims submitted or caused to be submitted by the Defendants. The government then makes payments to providers on claims which appeared to be eligible for reimbursement under Medicare Part B, and pursuant to a Medicare reimbursement schedule.

53.    Health care providers such as Defendants use Current Procedural Terminology ("CPT") and/or the International Classification of Diseases, Clinically modified (ICD-9-CM or ICD-10) or a HCPCS coding system depending upon the site of service.  Provider billing must identify the patient services provided and the medical diagnoses justifying the services. The ICD-9-CM system is used in the United States primarily for statistical classification systems to report vital statistics, but is also used by Medicare to determine diagnosis related groups (DRG) for inpatient hospital reimbursements. The HCPCS system reflects services, procedures and supplies used in treating a patient and it includes three levels of codes and modifiers.  Level 1 contains the five digit code noted above. HCPCS Level II is an alphanumeric code that enhances the CPT with a modifier used by physicians and for non-physician services, such as orthotics, ambulance, prosthetics. HPCS Level II codes are maintained and jointly used by CMS and the BlueCross and BlueShield and the Health Insurance Association of America. HPCS Level III (local assignment) are codes used for services by individual contractors to process Medicare claims. Local codes begin with series WY and Z, followed by 4 digits.

54.     Whatever a provider, including defendants, bill private or government carriers, the documents in the patient record must support the billing and code, and if not, the provider is not entitled to be paid, and because it is a false claim, it may be compelled to refund the payment amounts. *A Guide to Auditing Health Care Billing Practices*, Second Edition, Edford, Georgeann, MBA, RN, CCS-P;  (Atlantic Info Services, Inc. (2001).

55.     CPT codes are a uniform way to accurately describe medical, surgical and diagnostic services provided to patients and the codes are required when billing for services rendered to government and private beneficiaries.

56.     ICD-9-codes are also uniform codes, but reflect the diagnosis of the patient on a specific claim form. It also consists of a number and a descriptive term.  The codes are required when billing for services rendered to government and private beneficiaries.

## DEFENDANTS' FRAUDULENT STATEMENTS AND SUBMISSIONS TO MEDICARE, MEDICAID AND PRIVATE INSURERS

57.     USA Vein specializes in venous procedures, including Endovascular Laser Therapy ("EVLT"), also called Endovascular Ablation Therapy ("EVAT") and Microphlebectomy. USA Vein bills Medicare, Medicaid and private insurers for the EVLT procedure using CPT Codes, including  36478 and 36479, for surgery on the first vs. second vein respectively, 37765 and 37766 (microphlebectomy) and for various evaluation and management intake and visit codes including 99201-05 and 99211-15 and 99245  (referred to herein as "other CPT codes"). **See Codes, Group Exh. M attached hereto**.

58.     EVLT is a procedure which must be performed only by licensed physicians. In EVLT procedures, a catheter bearing a laser fiber is inserted into a varicose vein through a small

puncture using ultrasound guidance. The laser is then activated while the catheter is slowly withdrawn, resulting in the ablation of the vein.

59.     The time spent by defendants' physicians in the EVLT surgical procedure ranges from approximately 15 minutes to more than one hour depending on whether there are multiple veins, complications or other procedures performed at the same time. See attached Defendants' Operative Reports, ranging between 45 and over 60 minutes to allegedly perform EVLTs. Group **Exh. T** - Operative Reports (alleging *inter alia,* 45 minutes for 3 veins; 45 and 60 minutes for 2 veins, and 60 or more minutes for 1 vein).

60.     Based on defendants' records, there are dozens of days for which the number and nature of services billed by a single physician are so high that it is implausible that they were all rendered by that physician on that date.

61.     CPT Code 36478 is used to bill for "Endovenous ablation therapy of incompetent vein, extremity, inclusive of all imaging guidance and monitoring, percutaneous, laser; first vein treated". See, **Group Exh. M**.

62.     The Medicare and Medicaid reimbursement for services performed by USA Vein pursuant to the CMS physician fee schedule for CPT Code 36478 was approximately as follows: $1400.47 (2009), $1396.26 (2010), $1,462.68 (2011) and $1,448.98 (2012). See Physician Fee Schedules for 2009-12, **Exhs. I** and **P - S**, attached hereto.

63.     CPT Code 36479 is used to bill for "Endovenous ablation therapy of incompetent vein, extremity, inclusive of all imaging guidance and monitoring, percutaneous, laser; second and subsequent veins treated in a single extremity, each through separate access sites." See, **Group Exh. M**.

64.     The Medicare and Medicaid reimbursement for services performed by USA Vein under the CMS physician fee schedule for CPT Code 36479 was approximately as follows: $384.11 (2009), $394.34 (2010); $416.21 (2011) and $422.75 (2012).  See attached hereto as **Exhs. I, P - S.**

65.     USA Vein, by and through Dr. Katsnelson or his authorized agents, contracted with CMS to participate in the Medicare Program to accept assignment of the Medicare Part B payment for all services which the participant is eligible to accept assignment under the Medicare law and regulations.

66.     USA Vein, by and through Dr. Katsnelson or his authorized agents, also contracted with Medicaid of New York, Medicaid of California (Medi-Cal), and Medicaid of Massachusetts for reimbursement of all services for which the participant was eligible.

67.     Under the terms of the Medicare Provider Agreement, and the agreements with each of the state Medicaid funds, USA Vein, by and through Dr. Katsnelson, agreed to comply with and was bound by federal and state laws and regulations governing Medicare and Medicaid reimbursements.

68.     USA Vein, by and through Dr. Katsnelson, also contracted with private insurers, including Blue Cross Blue Shield of Illinois, Cigna, AARP, Aetna, United Healthcare, Allied Benefits System, Humana and Great West, for reimbursement of all services for which the patient was eligible.

69.     Defendants submitted claims for payment for 2009-2012 under CPT codes 36478 and 36479 and other CPT codes to private insurers, including Blue Cross Blue Shield of Illinois, Cigna, AARP, Aetna, United Healthcare, Allied Benefits System, Humana and Great West.

16

70.     During the relevant period Defendants submitted claims for payment under CPT Codes 36478 and 36479 and other CPT codes to Medicare, Medicaid  and private carriers using Form CMS 1500.  Submission of the Form CMS 1500 is a condition of payment for treaters like defendants.

71.     During the relevant period Defendants submitted claims for payment under CPT Codes 36478 and 36479 and other CPT codes, to Medicaid of New York, Medicaid of California (Medi-Cal), and Medicaid of Massachusetts using Form CMS 1500.

72.     With each claim for reimbursement to Medicare and Medicaid using the Form CMS 1500, Defendants certified that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations."  See Form 1500, **Exh. H, attached hereto**.

73.     With each claim submitted for reimbursement to Medicare using the Form CMS 1500, Defendants further acknowledge that "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties," and further "may upon conviction be subject to fine and imprisonment under applicable Federal laws. **See Exh. H, attached hereto**.

74.     USA Vein, by and through Dr. Katsnelson, was aware of, knew or should have known, or acted in reckless disregard of, the conditions of repayment under the Medicare and Medicaid Programs.

17

75. From at least 2009 to 2012, USA Vein Clinics, by and through Dr. Katsnelson, submitted thousands of claims for reimbursement totaling millions of dollars to Medicare, Medicaid and private insurers, including for endovenous laser therapy under CPT Codes 36478 and 36479 and under other Codes. See **Group Exh. M.**

### DEFENDANTS' FRAUD SCHEMES

76. At all relevant times herein, USA Vein, by and through Dr. Katsnelson, operated several medical clinics throughout the country, providing EVLT and other treatments and procedures to patients claimed to be diagnosed as suffering from venous insufficiency.

77. USA Vein advertises on its website that "costs are currently covered by Medicare and most insurance providers up to 100%," and boasts several testimonials of individuals whose procedures were completely covered by Medicare. **See Exh. F, attached hereto**.

78. As of October 2011, USA Vein had at least 30 employees, at least half of whom directly provided, or assisted in providing, the various treatments and procedures to patients.

79. USA Vein generated a portion of its revenue through billing patients for services not provided, inadequately provided or not medically necessary.

80. Between 2009 – 2012, USA Vein, by and through Dr. Katsnelson, employed a variety of fraudulent billing and medical practice schemes which were intended to defraud the government and private insurers.

81. USA Vein uses laser fibers marketed by Total Vein Systems to perform the EVLT procedures. The fibers are intended for either one-time or five-time use.

82. In about May 2011, Mr. Zverev and other employees of defendants discussed the improper medical and billing practices employed by Defendants that were used to defraud the

government and private insurers. Alex Margovsky, (USA Vein business analyst), Iryna Sypita (USA Vein medical assistant and technician), and Dr. Bryan Murray (USA Vein physician), confirmed to Mr. Zverev that Dr. Katsnelson was knowingly and intentionally sterilizing and reusing medical instruments necessary to perform the EVLT procedure, despite the fact that the instruments used are being manufactured for one-time use only. Dr. Katsnelson reused the instruments and instructed his treaters they were required to do so.

83.     On numerous occasions, Mr. Zverev observed used EVLT instruments soaking in solution to be reused.

84.     Notwithstanding the single use requirement of the medical instruments, defendants billed Medicare, Medicaid and private insurers, as if the procedure were properly conducted using new instruments.

85.     The re-use of EVLT instruments is dangerous - fiberglass portions of the instrument brittle and increase the risk it will shatter inside patients' veins. The efficacy of the instrument also declines upon every reuse, increasing the error rate for the procedure thus necessitating additional procedures to achieve the same intended outcome. These additional procedures are billed to Medicare and Medicaid as if they were performed on new veins using new laser fibers.

**A.     Claims for Services Never Rendered**

86.     In August 2011, Mr. Zverev was sent an e-mail by Cathy Mata, USA Vein's billing manager. Also copied on the e-mail was Dr. Katsnelson, Jekaterina Rapaport (USA Vein's insurance manager for Illinois) and Stella Gazaryan (USA Vein's office manager for California).

19

87.   The email stated to the effect that "I noticed that Dr. Katsnelson is billing in Boston and Chicago on the same date.  We should be more careful."

88.   After receiving the above e-mail, Mr. Zverev continued to investigate the billing practices of USA Vein.  He reviewed internal USA Vein Clinic databases and their derivative reports detailing patient demographic, visits and insurance coverage data, including that of Medicare and Medicaid.  See Disclosure Statement, Relator Docs 2, 4, 19.

89.   As set forth below, it was not plausible that defendants performed the services rendered and for which they sought claims for payment.

90.   For example, Mr. Zverev reviewed USA Vein patient data databases, which documented Dr. Katsnelson as performing eight (8) EVLT procedures on 8 different patients in Chicago while also conducting 5 initial patient visits in Boston on **October 12, 2009** - the same day. At least six of the patients billed were insured through Medicare or Medicaid.

91.   In short, Defendant Katsnelson purportedly performed 32 patient encounters, including thirteen EVLTs in two Chicago Clinics and also in Boston, **on October 12, 2009**, plus travel between Boston and Chicago.

92.   Defendants submitted claims for payment to government and private carriers, and were reimbursed, including the following for services allegedly rendered on October 12, 2009 as follows,  showing Location, Date of Service, CPT Code and approximate payment amounts:

20

| | | | |
|---|---|---|---|
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36478 | 1100 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36478 | 1209 |
| CHI1 | 10/12/2009 | 37765 | 198.4 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36478 | 1209 |
| CHI1 | 10/12/2009 | 37765 | 198.4 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36478 | 1209 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36479 | 331 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 37765 | 198.4 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36478 | 1209 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36479 | 331 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| CHI1 | 10/12/2009 | 37765 | 198.4 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36478 | 1100 |
| IL - ELK GROVE VILLAGE 2 | 10/12/2009 | 36479 | 331 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36478 | 1188 |
| CHI1 | 10/12/2009 | 36479 | 329.8 |
| NULL | 10/12/2009 | 36478 | 1581 |
| BOS1 | 10/12/2009 | 36478 | 1388 |
| MA - LINCOLN | 10/12/2009 | 36478 | 1390 |
| BOS1 | 10/12/2009 | 36478 | 1388 |
| MA - LINCOLN | 10/12/2009 | 36478 | 1390 |
| MA - LINCOLN | 10/12/2009 | 36478 | 1390 |
| MA - LINCOLN | 10/12/2009 | 36478 | 1390 |
| MA - LINCOLN | 10/12/2009 | 36478 | 1390 |
| MA - LINCOLN | 10/12/2009 | 36479 | 368.4 |

93.     Mr. Zverev also reviewed USA Vein patient data databases, which documented Dr. Katsnelson allegedly conducting approximately (41) patient visits, (19) in Chicago, (8) in New York, and (14) in Boston including performing (10) EVLT procedures on (10) different patients, (6) in Boston, (3) in Chicago and (1) in New York on **March 22, 2010** - the same day.

94.     On March 22, 2010, Dr. Katsnelson flew on an American Airlines flight at 7:09 a.m. from O'Hare and landed in Boston at 10:14 a.m. He departed Boston the next day, on

March 23, 2013 at 5:22 p.m. and arrived at O'Hare at 7:20 p.m. Accordingly, he was not in Chicago or New York and did not perform any of the services rendered, billed and/or for which he was paid in those cities on those dates.

95.     Defendants submitted claims for payment to government and private carriers, and were reimbursed, including the following, showing Location, Date of Service, CPT Code and approximate payment amounts:

| Location | Date of Service | CPT Code | Payment |
|---|---|---|---|
| CHI1 | 3/22/2010 | 36478 | 1227 |
| CHI1 | 3/22/2010 | 36479 | 351.8 |
| CHI1 | 3/22/2010 | 36478 | 1227 |
| CHI1 | 3/22/2010 | 36479 | 351.8 |
| CHI1 | 3/22/2010 | 36478 | 1227 |
| CHI1 | 3/22/2010 | 36479 | 351.8 |
| CHI1 | 3/22/2010 | 36478 | 1227 |
| CHI1 | 3/22/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 3/22/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 3/22/2010 | 36479 | 347.3 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 0 |
| MA - WEST ROXBURY | 3/22/2010 | 36479 | 0 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 36479 | 374.4 |
| NULL | 3/22/2010 | 36478 | 184.2 |
| NULL | 3/22/2010 | 36479 | 0 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 37765 | 202.3 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 37765 | 202.3 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/22/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/22/2010 | 36479 | 374.4 |

96.     In short, Defendant Katsnelson purportedly conducted 41 patient visits in three cities on **March 22, 2010**, plus travel between the three cities of Boston, Chicago and New York.

97.     At least (31) of (41) patients billed for EVLT procedures on **March 22, 2010** were insured through Medicare or Medicaid, including elderly patients of Eastern European descent.

98.     Mr. Zverev reviewed USA Vein patient data databases, which documented Dr. Katsnelson conducting (31) patient visits, (9) in Chicago, (2) in New York, and (20) in Boston including performing approximately (17) EVLT procedures on (17) different patients, (11) in Boston, and (6) in Chicago on **March 23, 2010** - the same day. At least (26) of (31) patients billed for services the day before on **March 22, 2010** were insured through Medicare or Medicaid, including patient SP documented as being re-treated in Massachusetts on **March 23, 2010.**

99.     In short, Defendant Katsnelson purportedly conducted 31 patient visits in three different cities on **March 23 2010,** plus travel between the multiple cities, including Boston and Chicago.

100.     Defendants submitted claims for payment to government and private carriers, and were reimbursed, including the following, showing Location, Date, Service, CPT Code, and approximate payment amounts:

23

| | | | |
|---|---|---|---|
| CHI1 | 3/23/2010 | 36478 | 1227 |
| ELKG | 3/23/2010 | 36478 | 1227 |
| CHI1 | 3/23/2010 | 37765 | 217.5 |
| CHI1 | 3/23/2010 | 36478 | 1227 |
| CHI1 | 3/23/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 3/23/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 3/23/2010 | 36479 | 347.3 |
| CHI1 | 3/23/2010 | 36478 | 1227 |
| CHI1 | 3/23/2010 | 36479 | 351.8 |
| CHI1 | 3/23/2010 | 36478 | 1227 |
| IL - NORTHBROOK | 3/23/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 3/23/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 3/23/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 3/23/2010 | 36479 | 347.3 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 0 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 0 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| NULL | 3/23/2010 | 36478 | 184.2 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/23/2010 | 37765 | 202.3 |
| BOS1 | 3/23/2010 | 36478 | 1387 |
| BOS1 | 3/23/2010 | 36479 | 378.6 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 0 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 0 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| BOS1 | 3/23/2010 | 36478 | 1387 |
| BOS1 | 3/23/2010 | 36479 | 378.6 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 3/23/2010 | 36479 | 374.4 |

101. Mr. Zverev reviewed USA Vein patient data databases, which documented that on May 19, 2010, Dr. Yan Katsnelson allegedly conducted (27) patient visits, comprised of (20)

in the Chicago Northbrook office, (3) in the Chicago Belmont office, and (4) in Boston. The claims included EVLTs, microphlebectomy, and other patient encounters. Additionally, defendants submitted claims for payment to Medicare for 10 patient visits and surgeries by Dr. Kolesnikov, although the medical records document defendant Katsnelson as the treating provider. All claims for services purportedly rendered by Dr. Yan Katsnelson were submitted for payment to Medicare or Blue Cross/Blue Shield of Illinois.

102.    In fact, Dr. Yan Katsnelson flew to Boston from O'Hare at 6:50 a.m. on May 19, 2010 and arrived in Boston at 10:00 a.m.  He left Boston at 6:49 p.m. and arrived at O'Hare at 8:06 p.m. that evening. He did not perform any of the services allegedly rendered in Chicago on May 19, 2010 because he was in Massachusetts and not in the City of Chicago.

103.    Defendants submitted claims for payment to government and private carriers, and were reimbursed, including the following, showing Location, Date  Service, CPT Code and approximate payment amounts:

| | | | |
|---|---|---|---|
| BLMT | 5/19/2010 | 36478 | 1227 |
| BLMT | 5/19/2010 | 36479 | 351.8 |
| BLMT | 5/19/2010 | 36478 | 1227 |
| BLMT | 5/19/2010 | 36479 | 351.8 |
| BLMT | 5/19/2010 | 37766 | 272.4 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| BLMT | 5/19/2010 | 36478 | 1227 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 5/19/2010 | 37765 | 209.1 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| IL - NORTHBROOK | 5/19/2010 | 36478 | 1220 |
| IL - NORTHBROOK | 5/19/2010 | 36479 | 347.3 |
| NULL | 5/19/2010 | 36478 | 344.1 |
| NULL | 5/19/2010 | 36479 | 93.6 |
| MA - WEST ROXBURY | 5/19/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 5/19/2010 | 36479 | 374.4 |
| NULL | 5/19/2010 | 36478 | 344.1 |
| NULL | 5/19/2010 | 36479 | 93.6 |
| NULL | 5/19/2010 | 36478 | 344.1 |
| NULL | 5/19/2010 | 36479 | 93.6 |
| NULL | 5/19/2010 | 36478 | 344.1 |
| NULL | 5/19/2010 | 36479 | 93.6 |
| NULL | 5/19/2010 | 36478 | 344.1 |
| NULL | 5/19/2010 | 36479 | 93.6 |
| MA - WEST ROXBURY | 5/19/2010 | 36478 | 1376 |
| MA - WEST ROXBURY | 5/19/2010 | 36479 | 374.4 |
| NULL | 5/19/2010 | 36478 | 344.1 |
| NULL | 5/19/2010 | 36479 | 93.6 |

104.    Based on his review of Defendants' databases, Mr. Zverev also determined that

Dr. Katsnelson and Defendants had billed Medicare, Medicaid and private insurers, for an

impossibly high number of procedures as well as other patient visits conducted in a single day.

In one instance, Dr. Katsnelson is documented conducting 37 patient visits, and among those

performing 19 EVLT procedures on **November 8, 2010.**  At least (12) of the patients were

Medicare or Medicaid beneficiaries. Defendants submitted claims for payment to government and private carriers, and were reimbursed, including the following, showing Location, Date Service, CPT Code and approximate payment amounts:

| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| IL - NORTHBROOK | 11/8/2010 | 37765 | 213.7 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 37765 | 217.5 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 37765 | 217.5 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| IL - NORTHBROOK | 11/8/2010 | 37766 | 262.8 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 37765 | 217.5 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| WHLG | 11/8/2010 | 37765 | 217.5 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 11/8/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 11/8/2010 | 36479 | 354.9 |
| WHLG | 11/8/2010 | 36478 | 1227 |
| WHLG | 11/8/2010 | 36479 | 351.8 |

105.    Dr. Katsnelson is documented as conducting 38 patient visits, among them performing 22 EVLT procedures on **December 17, 2010.**  At least (9) of the patients, were Medicare or Medicaid beneficiaries.  Defendants submitted claims for payment to government and private carriers, and were reimbursed, including the following, showing Location, Date, Service, CPT Code and approximate payment amounts:

| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 12/17/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 12/17/2010 | 36479 | 354.9 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 37765 | 217.5 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 37766 | 272.4 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 37766 | 272.4 |
| IL - NORTHBROOK | 12/17/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 12/17/2010 | 36479 | 354.9 |
| IL - NORTHBROOK | 12/17/2010 | 37766 | 262.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| IL - NORTHBROOK | 12/17/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 12/17/2010 | 36479 | 354.9 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 37765 | 217.5 |
| IL - NORTHBROOK | 12/17/2010 | 36478 | 1247 |
| IL - NORTHBROOK | 12/17/2010 | 36479 | 354.9 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |
| WHLG | 12/17/2010 | 36478 | 1227 |
| WHLG | 12/17/2010 | 36479 | 351.8 |

28

106.    Dr. Katsnelson billed for the provision of 134 services to over 41 patients on March 5, 2012, in his Northbrook office, including at least 10 initial visits which he typically documents as taking 90 minutes (i.e., a total of 15 hours for just these ten services). At least 48 procedures were allegedly performed on Blue Cross/Blue Shield patients, and 42 procedures on Medicare patients. Defendants submitted claims for payment to government and private carriers, and were paid $53,191.87 for this date.

107.    Comparing the billing and patient data spreadsheets Mr. Zverev determined that Dr. Katsnelson and defendants' physicians were billing for more procedures and visits than he actually performed, or in other words, for services never rendered.  For example, on **March 8, 2011**, the patient data spreadsheet indicates that Dr. Katsnelson allegedly performed only 18 procedures or other patient visits, while the billing spreadsheet indicates that he billed insurance providers for 43 procedures.  Many of the patients were Medicare and/or Medicaid beneficiaries.

108.    In conversations in about March 2012 to June 2012, Dr. Melkonyan stated to Mr. Zverev that he had been asked by Dr. Katsnelson to sign off on several altered and backdated patient charts, which reflected services which Dr. Melkonyan had never performed.  The charts were used by Defendants to bill government and private carriers. Dr. Melkonyan told Relator that he resigned under severe duress on May 14, 2012.

109.    Defendants knowingly and intentionally defrauded Medicare, Medicaid and private insurers, by falsifying records and submitting claims for reimbursement for services never rendered.

### B. Reuse Fibers

110.    USA Vein clinics use single-use laser fibers sold and marketed by Total Vein System when performing the EVLT procedures.  In particular, USA Vein uses the 400 and 600

micron core single use optical fibers. The instructions state "the product is a single use product not intended for reprocessing or reuse." **See Exh. J, attached hereto**.

111. The 400 and 600 micron core single use fiber optics are the substantial equivalent of the FDA approved BARD ENDOBEAM Holmium Laser Fiber, which is also a single-use laser fiber utilized by physicians in performing ablation therapy. FDA-mandated warnings for the BARD ENDOBEAM laser fiber state "[f]or single use fiber, do not sterilize any portion of the device. Reuse and/or repackaging may create a risk of patient or user infection, compromise the structural integrity and/or essential material and design characteristics of the device, which may lead to device failure, and/or lead to injury, illness or death." **See Exh. K, attached hereto**.

112. The 400 and 600 micron core single optics are also the substantial equivalent of the FDA approved DuoTome SideLite fiber, which is also a single-use fiber utilized by physicians in performing ablation therapy. FDA-mandated warnings for the DuoTome SideLite fiber state as the post-operative instructions "[t]he DuoTome SideLite fiber is a single-use device. Do not reuse or re-sterilize the fiber." **See Exh. L, attached hereto**.

113. Shortly after his employment commenced, Mr. Zverev became aware that defendants practice was to sterilize and reuse single-use fibers multiple times for EVLT surgery.

114. Dr. Katsnelson and other USA Vein physicians knew or should have known that sterilization and/or reuse of the fibers reduced the effectiveness of the instrument and presented a substantial risk to the patients upon whom the instrument was being used.

115. Dr. Katsnelson and other USA Vein physicians knew or should have known, and admitted to Mr. Zverev, that because sterilization and/or reuse of the fibers reduced the effectiveness of the instrument at closing veins, more procedures than necessary would be required to achieve the same medical result in treating affected veins.

116.    Dr. Melkonyan and Dr. Murray, and Ms. Iryna Sypita, a medical technician, told Mr. Zverev in 2011, that Dr. Katsnelson was using, and ordering other USA Vein physicians to use, one-time use fibers multiple times.  Mr. Zverev was told that these fibers were sterilized by using extreme heat and a sterilization solution and often used more than a dozen times before being disposed.

117.    Mr. Zverev's office was located in the same building as the clinic and on several occasions he walked through the clinic.  On at least 12 occasions, Mr. Zverev saw used one-time use fibers soaking in sterilization solution.

118.    On at least 12 occasions, Mr. Zverev saw previously used one-time use fibers, which had already been used, placed in a surgical bin to be used in a future procedure.

119.    During the summer of 2011, Zverev had an in-person conversation with Ms. Sypita, a Medical Assistant directly involved in performing the EVLT procedure in Illinois, regarding the reuse of one-time use fibers. Ms. Sypita told Zverev that Dr. Katsnelson, as a matter of practice, repeatedly ordered her and other technicians to sterilize the one-time use fibers and reuse them, and they did so. Ms. Syptia also complained that Dr. Katsnelson, as a matter of practice, would wear protective eyewear in order to avoid laser radiation damage to his eyes, while not providing the staff assisting him with such protective eyewear.  No providing the protective eyewear exposes the staff to substantial risk eye damage.

120.    Mr. Zverev also discussed on several occasions with Dr. Sam Ebrahimi, a physician formerly employed by USA Vein to perform EVLT procedures in California, the improper medical and billing practices at USA Vein.  Dr. Ebrahimi told Mr. Zverev in 2011 that USA Vein physicians, including Dr. Ebrahimi, were ordered by Dr. Katsnelson to use the one-time use fibers on up to 15 different veins on the same leg at the same time.

121.    Mr. Zverev was told by Dr. Ebrahimi that he had witnessed Dr. Katsnelson and other physicians re-sterilize the one-time use fibers and reuse them.

122.    Mr. Zverev was told by Dr. Ebrahimi that over the course of several sterilizations of the one-time use fibers, the fibers became less effective, requiring additional procedures to be performed in following sessions, that would not have otherwise been necessary.

123.    Medicare reimbursement for performing the EVLT procedure includes reimbursement for the single-use laser fiber.  **See Group Exh. M, attached hereto**.

124.    By sterilizing and re-using the single-use fibers USA Vein Defendants were able to obtain and/or inflate claims for payments from the Government and private insurers as "new" fibers, which but for the false statements, would not have been paid.

125.    USA Vein, by and through Dr. Katsnelson, knowingly and intentionally submitted claims for reimbursement to Medicare, Medicaid and/or private insurers, for procedures performed as if using the new instruments when in fact they were reusing instruments.  This fraudulent maximization of federal and commercial reimbursement resulted in higher income and other payments to each Defendant and in failed procedures requiring follow-up EVLT treatments that would not have been necessary had proper medical procedure been followed by Defendants.

126.    Accordingly, all reimbursement claims submitted to Medicare, Medicaid and/or private insurers, for procedures performed using sterilized and/or re-used laser fibers were improper and fraudulent.

### C.    Claims for Medically Unnecessary Services

127.    Providers may seek payment from Medicare for services rendered, but may only be reimbursed by Medicare or Medicaid for providing health care services that are certified as being "reasonable and necessary."  42 U.S.C. § 1395y(a)(1).

128.   Medical necessity is certified by the physician on the Form CMS 1500 when seeking reimbursement. Physicians indicate medical necessity by documenting the diagnosis made by the physician and the corresponding ICD-9-CM code. ICD-9 is an acronym standing for the Internal Classification of Disease, 9th Edition, the coding system currently recognized by CMS for the purpose of reimbursements.

129.   CMS currently recognizes the following ICD-9 codes, and corresponding diagnosis, as medically necessary to perform the EVLT procedure:

> 454.1: Varicose veins, inflamed or infected
> 454.1: Varicose veins, stasis dermatitis
> 454.1: Varicose veins, lower, ulcer
> 454.8: Varicose veins with pain, swelling
> 454.8: Varicose veins with other complications NEC
> 454.2: Varicose veins with ulcer - inflamed or infected
> 454.0 : Varicose ulcer (lower extremity, any part)

130.   Mr. Zverev reviewed Defendants' internal reports, which indicated that USA Vein ultrasound technicians recommended a "positive diagnoses," indicating a need for surgery, at a significantly higher rate than would be expected.

131.   From September 1, 2010, through August 31, 2011, USA Vein ultrasound technicians recommended surgery in 80% of the roughly 3,700 cases. 1,245 of the patients for whom a positive diagnosis was recommended were insured by a government payor, and roughly 2000 of the patients for whom a positive diagnosis was recommended were insured by a private insurer.

132.   Mr. Zverev also determined after reviewing Defendants' data reports that USA Vein ultrasound technicians located in Illinois, and worked with Dr. Katsnelson on a near-daily basis, recommended a "positive diagnosis" at a significantly higher rate than all other ultrasound technicians employed by USA Vein. In particular:

- From September 1, 2010, through August 31, 2011, Ms. Agnieszka Zoltkowski (USA Vein ultrasound technician employed in Illinois) made a "positive diagnosis" that surgery was required in 97.35% of her 340 cases. 131 of the patients for whom a positive diagnosis was recommended were insured by a government payor. Over 150 of the patients for whom a positive diagnosis was recommended were insured by private carriers, including Blue Cross Blue Shield of Illinois, Humana, Cigna, Aetna and United Healthcare.

- From September 1, 2010, through August 31, 2011, Mr. Alex Belianski (USA Vein ultrasound technician employed in Illinois) made a "positive diagnosis" that surgery was required in 89.91% of his 159 cases. 53 of the patients for whom a positive diagnosis was recommended were insured by a government payor. Over 75 of the patients for whom a positive diagnosis was recommended were insured by private carriers, including Blue Cross Blue Shield of Illinois, Humana, Cigna, Aetna and United Healthcare.

- From September 1, 2010, through August 31, 2011, Ms. Irina Ruderman (USA Vein ultrasound technician employed in Illinois) made a "positive diagnosis" that surgery was required in 93.75% of her 16 cases. Eight (8) of the patients for whom a positive diagnosis was recommended were insured by a government payor. Six (6) of the patients for whom a positive diagnosis was recommended were insured by private carriers, including Blue Cross Blue Shield of Illinois and United Health Care.

- From September 1, 2010, through August 31, 2011, Ms. Malgorzata Timkovic (USA Vein ultrasound technician employed in Illinois) made a "positive diagnosis" that surgery was required in 98.77% of her 163 cases. 67 of the patients for whom a positive diagnosis was recommended were insured by a government payor. Over 75 of the patients for whom a positive diagnosis was recommended were insured by private carriers, including Blue Cross Blue Shield of Illinois, Humana, Cigna, Aetna and United Healthcare.

127. Dr. Katsnelson ordered ultrasound technicians to make as many "positive diagnoses" as possible, even in cases where no procedure was medically necessary, in order to increase the number of EVLT procedures performed and consequently the number of claims submitted to government and private insurers for reimbursement.

128. Drs. Murray, Melkonyan and Ebrahimi told Mr. Zverev in 2011 that USA Vein physicians, as ordered by Dr. Katsnelson, performed EVLT procedures on the same vein multiple times within a period of less than two months without a determination of medical necessity.

129.    Physicians employed by USA Vein were under intense pressure and scrutiny from Dr. Katsnelson to perform and submit claims for as many EVLT surgeries as possible.

130.    By telephone conversation in 2012, Dr. Murray told Mr. Zverev that Dr. Katsnelson ordered physicians that when performing the EVLT procedure on a primary vein, to subsequently perform the procedure on as many secondary veins as possible, regardless of whether the procedure was necessary on all veins.

131.    Drs. Murray, Melkonyan and Ebrahimi told Mr. Zverev in 2011 that USA Vein physicians, as ordered by Dr. Katsnelson, indicated ICD-9 codes on Medicare and Medicaid submissions for reimbursement consistent with a finding of medical necessity when such a diagnosis had never been made and was not consistent with the health status of the patient.

132.    Drs. Murray, Melkonyan and Ebrahimi told Mr. Zverev that Dr. Katsnelson and other USA Vein physicians, by order from Dr. Katsnelson, recommend to patients the need for EVLT procedures when, in fact, the patients did not meet any of the accepted ICD-9 indications for medical necessity.

133.    Dr. Katsnelson also offered monetary incentives to physicians based on the number of EVLT procedures performed and billed, including procedures performed on the secondary veins.

134.    Beginning in 2011, Dr. Katsnelson requested Relator compile data for the number of EVLT procedures performed by USA Vein physicians.  Dr. Katsnelson told relator that the data was needed to determine "incentives" for physicians.

135.    Dr. Katsnelson asked for the physician EVLT procedure data at least once a month through Relator's termination.

136.    The Defendants knowingly and intentionally repeatedly defrauded Medicare and/or Medicaid by falsifying records and submitting claims for reimbursement for medically unnecessary services.

137.    Accordingly, reimbursement claims submitted to Medicare and/or Medicaid were improper and fraudulent.

**D.      Solicitation of Patients**

138.    One of the tasks assigned Mr. Zverev by Dr. Katsnelson during his tenure at USA Vein was to create a computer program designed to track the amount of time elapsed since a patient's most recent visit.  He was then required to send a notification to USA Vein's call center to contact the individual after a certain period of time had elapsed to make appointments for additional visits, follow ups, EVLT or other surgical procedures to be performed.

139.    The call center is located in Northbrook, Illinois, by day, is staffed by six employees.  There is also an employee on call 24 hours a day. The purpose of the call center is to make as many patient appointments as possible with incoming current and prospective patients and questions from individual providers who call in.  Call center representatives  were required by Dr. Katsnelson to solicit appointments from prior patients and recommend additional visits, follow up, EVLT and other procedures, even when procedures were not medically necessary.

140.    Employees at the USA Vein call center were routinely told by Dr. Katsnelson to ignore whether the EVLT procedures were medically necessary when attempting to solicit patients for additional appointments and procedures.

141.    In addition to soliciting additional procedures from former patients through the USA Vein call center, irrespective of truth or medical necessity, defendants' physicians were routinely ordered by Dr. Katsnelson to recommend during follow-up visits that patients'

36

conditions had not improved and required additional EVLT procedures, resulting in additional surgeries when none were required.

142.    Each additional EVLT procedure was billed to Medicare and Medicaid as if medically necessary, despite lacking a determination of medical necessity actually being made by the physician.

143.    Defendants knowingly and intentionally repeatedly defrauded Medicare, Medicaid and/or private insurers, by falsifying records and submitting claims for reimbursement for procedures unlawfully solicited and recommended without a determination of medical necessity.

**E.    Termination of Relator**

144.    On or about October 2011 Mr. Zverev became aware, through statements and actions of Dr. Katsnelson, that Dr. Katsnelson knew he was investigating Defendants' billing and medical practices.

145.    Among other things, defendant Katsnelson had a family member monitoring Mr. Zverev's computer activities.

146.    On or about the afternoon of October 22, 2011, Dr. Katsnelson unexpectedly approached Mr. Zverev at the outside table of the local restaurant, questioned what he was doing in defendants' database. He demanded the laptop computer which Mr. Zverev routinely took home, be handed to him immediately.

147.    Later the same Saturday night, Mr. Zverev was called on his personal phone by Dr. Yan Katsnelson, telling Mr. Zverev he had two minutes to tell Dr. Katsnelson his laptop password, followed by the same directive from wife Dr. Flora Katsnelson. She said if Mr. Zverev did not give it to her, "the police will be at your house". Mr. Zverev was driving on a

highway. Flora Katsnelson demanded he pull over "immediately" and text her the password. Mr. Zverev dictated the password to Dr. Flora Katsnelson.

148. At 11:59 PM on the same day, Mr. Zverev received an email from Dr. Flora Katsnelson stating that his employment was terminated, followed by a letter.

149. Following Mr. Zverev's termination, Dr. Katsnelson forbade his employees from talking to Mr. Zverev, and issued a cease and desist letter to Mr. Zverev prohibiting him from talking to his employees.

150. Mr. Zverev's termination came while he was still investigating Defendants' fraudulent medical and billing procedures by searching spreadsheets and databases and speaking with Defendants' employees.

151. Defendants' had the technological capability to track Mr. Zverev's electronic searches of USA Vein Clinic databases and spreadsheets while he was conducting his investigation in to Defendants' fraudulent practices.

152. Defendants employed, and had access to, all of the individuals Mr. Zverev spoke with during his investigation of Defendants' fraudulent practices.

153. As an information technology and data analyst employee for USA Vein, Zverev had been given unfettered access to a company laptop computer during his entire tenure with the Company, including home use.

154. Mr. Zverev took a USA Vein laptop computer home nearly every day during his tenure at USA Vein, and was never told that he needed to request permission to do so, nor did any company policy require him to do so.

155.     Dr. Katsnelson was aware that Mr. Zverev routinely took a USA Vein laptop home for work purposes and never required Mr. Zverev to seek permission on each occasion prior to October 2011.

<u>**COUNT I**</u>
**FALSE CLAIMS ACT 31 U.S.C. §3729(a)(1)(A)**

156.     Mr. Zverev repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

157.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

158.     Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who -

(1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval.

159.     Section 1 further provides that in the event of a violation, such a person is liable to the Unites States for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the United States sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

160.     On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

(1)     any person who –

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

161.    USA Vein knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for procedures that were never performed, claims that were inadequately performed and claims for payment of services that were not medically necessary.

162.    Dr. Katsnelson knowingly caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for procedures that were never performed, claims that were inadequately performed and claims for payment of services that were not medically necessary.

163.    Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.

164.    By virtue of the false or fraudulent claims presented or caused to be presented by the Defendants, the United States has suffered damages.

165.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

**WHEREFORE**, Mr. Zverev respectfully requests that this Court enter judgment against the Defendants as follows:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, et seq.;

2.    That the United Stated be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 et seq. provides;

3.   That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States;

4.   Mr. Zverev be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);

5.   Mr. Zverev be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

6.   Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and

7.   That this Court award the United States and Mr. Zverev such other and further relief as it deems just and proper.

## <u>COUNT II</u>
## FALSE CLAIMS ACT 31 U.S.C. §3729(a)(1)(B)

166.   Mr. Zverev repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

167.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

168.   Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who -

(2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

169.   Section 2 further provides that in the event of a violation, such a person is liable to the Unites States for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the United States sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

170.    On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

(1)    any person who –

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

171.    At all times relevant herein, USA Vein knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid.  Such false material records and statements include, but are not limited to, the false entries in the Form CMS 1500 submitted to CMS for reimbursement of EVLT procedures from Medicare.

172.    At all times relevant herein, Dr. Katsnelson knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid.  Such false material records and statements include, but are not limited to, the false entries in the CMS Form 1500 submitted to CMS for reimbursement of EVLT procedures from the Medicare Trust Fund.

173.    By virtue of the false or fraudulent records and statements made, used, or caused to be made or used by the Defendants, the United States has suffered damages.

174.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

**WHEREFORE**, Mr. Zverev respectfully requests that this Court enter judgment against the Defendants as follows:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C § 3729 et seq.;

42

2.      That the United Stated be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 et seq. provides;

3.      That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States;

4.      Mr. Zverev be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);

5.      Mr. Zverev be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

6.      Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

7.      That this Court award the United States and Mr. Zverev such other and further relief as it deems just and proper.

<u>**COUNT III**</u>
**FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)**

176.    Mr. Zverev repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

177.    Prior to May 20, 2009, 31 U.S.C. § 3729(a) provided, in relevant part, liability for any person who -

(3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

178.    Section 3 further provides that in the event of a violation, such a person is liable to the Unites States for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the United States sustains because of the act of that person. A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

179.    On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for:

>    (1)    any person who -

>        (c)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

180.    At all times relevant herein, Defendants, and each of them, knowingly conspired to present, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for procedures that were never performed, claims that were inadequately performed and claims for payment of services that were not medically necessary

181.    At all times relevant herein, Defendants knowingly conspired to  make, use, or cause to be make or use, false records or statements material to false or fraudulent claims to the United States and false records or statements to get false claims paid. Such false material records and statements include, but are not limited to, the false entries in the Form CMS 1500 submitted to CMS for reimbursement of EVLT procedures from Medicare.

182.    By virtue of Defendants' conspiracy to present or cause to be presented false or fraudulent claims to the United States, as well as Defendants' conspiracy to make, use, or cause to be made or used false or fraudulent records and statements, the United States has suffered damages.

183.    Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

**WHEREFORE**, Mr. Zverev respectfully requests that this Court enter judgment against the Defendants as follows:

1.  Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, et seq.;

2.  That the United Stated be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 et seq. provides;

3.  That civil penalties of $5,500 to $11,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States;

\*

4.  Mr. Zverev be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);

5.  Mr. Zverev be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

6.  Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

7.  That this Court award the United States and Mr. Zverev such other and further relief as it deems just and proper.

### COUNT IV
### False Claims Act 31 U.S.C. §3730(h)

184.    Mr. Zverev repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

185.    Mr. Zverev took lawful actions in furtherance of a False Claims Act action, including investigation for, initiation of, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act.

186.    As a result of investigating Defendants' false and fraudulent conduct in an attempt to bring it to light, Mr. Zverev was subjected retaliation and termination.

187.    Such conduct was in violation of the False Claims Act, 31 U.S.C. § 3730(h).

188.    Through Defendants' actions in violation of the False Claims Act, 31 U.S.C. §

3730(h), Mr. Zverev has suffered damages including, but not limited to, loss of his job and

income, loss of career opportunities, and humiliation.

**WHEREFORE**, Mr. Zverev respectfully requests that this Court enter judgment against

the Defendants as follows:

1.    Mr. Zverev be awarded all litigation costs, expert fees, and reasonable attorneys' fees incurred as provided pursuant to 31 U.S.C. § 3730(h) and other applicable law;

2.    Mr. Zverev be awarded the maximum damages allowed pursuant to 31 U.S.C. § 3730(h), including such relief to make him whole for the damages and financial losses suffered, including, but not limited to, two times the amount of back pay, pre- and post-judgment interest, punitive and compensatory damages, and all litigation costs and reasonable attorneys' fees and costs;

3.    Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

4.    That this Court award the United States and Mr. Zverev such other and further relief as it deems just and proper.

## <u>COUNT V</u>
## CALIFORNIA FALSE CLAIMS ACT, Cal. Gov't Code § 12651 *et seq.*

189.    Mr. Zverev re-alleges and incorporates by reference the allegations contained in

the above paragraphs of this Complaint.

190.    This is a qui tam action brought by Relator on behalf of the State of California to

recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't.

Code § 12650 et seq.

191.    Cal. Gov't Code § 12651(a) provides liability for any person who

(1)    knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

46

(2)     knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3)     conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4)     is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

192.    Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by its deliberate and systematic violation of federal and state laws and by virtue of the fact that thousands of the claims submitted in connection with its conduct were eligible for reimbursement by the government funded healthcare programs.

193.    The State of California, by and through the California Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

194.    Compliance with applicable Medicare, Medi-cal and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' conduct.

195.    Had the State of California known that claims had been submitted for reimbursement of procedures that had never been performed, or were performed inadequately or unnecessarily, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

196.    As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

197.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of herself and the State of California.

198.    Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

**WHEREFORE**, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of California:

1.    Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

2.    A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

3.    Prejudgment interest; and

4.    All costs incurred in bringing this action.

To Relator:

1.    The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

2.    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

3.    An award of reasonable attorneys' fees and costs; and

4.    Such further relief as this Court deems equitable and just.

## COUNT VI
## MASSACHUSETTES FALSE CLAIMS ACT, MASS. ANN. LAWS CB.12, § S(A)-(0)

199.    Relator realleges and incorporates by reference the above paragraphs as though fully set forth herein.

200.    This is a qui tam action brought by Relator on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5(A) et seq.

201.    Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who-

(1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

(3)    conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(4)    is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

202.    Defendants violated Mass. Gen. Laws Ann. Chap. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by its deliberate and systematic violation of federal and state laws, and by virtue of the fact that thousands of the claims submitted in connection with its conduct were eligible for reimbursement by the government-funded healthcare programs.

203.     The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

204.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct.

205.     Had the Commonwealth of Massachusetts known that claims had been submitted for reimbursement of procedures that had never been performed, were performed inadequately or unnecessarily, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

206.     As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

207.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

208.     Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of Massachusetts in the operation of its Medicaid program.

**WHEREFORE**, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the Commonwealth of Massachusetts:

1.      Three times the amount of actual damages which the Commonwealth of

        Massachusetts has sustained as a result of Defendants' conduct;

2.      A civil penalty of not less than $5,000 and not more than $10,000 for each false
        claim which Defendants caused to be presented to the Commonwealth of
        Massachusetts;

3.      Prejudgment interest; and

4.      All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap.
        12, §5F and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection
        with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## <u>COUNT VII</u>
## NEW YORK FALSE CLAIMS ACT, N.Y. State Fin. Law §187 et seq.

209.    Relator realleges and incorporates by reference the above paragraphs as though

fully set forth herein.

210.    This is a qui tam action brought by Relator on behalf of the State of New York

to recover treble damages and civil penalties under the New York False Claims Act, 2007

N.Y. Laws 58, Section 39, Article XIII (McKinney's State Finance Laws §187 et seq.).

211.    The New York False Claims Act provides liability for any person who:

(a)     Knowingly presents, or causes to be presented, to any employee,
        officer or agent of the state or local government, a false or fraudulent
        claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the
        state or local government;

51

(c)     conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

212.    Defendants violated the New York False Claims Act and knowingly caused false claims to be made, used and presented to the State of New York by its deliberate and systematic violation of federal and state laws, and by virtue of the fact that thousands of the claims submitted in connection with its conduct were eligible for reimbursement by the government-funded healthcare programs.

213.    The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted for reimbursement.

214.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' conduct.

215.    Had the State of New York known that claims had been submitted for reimbursement of procedures that had never been performed, were performed inadequately or unnecessarily, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

216.    As a result of Defendants' violations of 2007 N.Y. Laws 58, Section 39, Article XIII, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

217.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, on behalf of herself and the State of New York.

218.    Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of New York in the operation of its Medicaid program.

**WHEREFORE**, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

To the State of New York:

1.    Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

2.    A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendants caused to be presented to the State of New York;

3.    Prejudgment interest; and

4.    All costs incurred in bringing this action.

To Relator:

1.    The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII (McKinney's State Finance Laws §190), and/or any other applicable provision of law;

2.    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

3.    An award of reasonable attorneys' fees and costs; and

4.    Such further relief as this Court deems equitable and just.

<u>COUNT VIII</u>
**VIOLATION OF THE INSURANCE CLAIMS FRAUD PREVENTION ACT**

219.    Relator realleges and incorporates by reference the above paragraphs as though fully set forth herein.

220.    This action is brought by Mr. Zverev to recover treble damages and civil penalties under 740 Ill. Comp. Stat. § 92/1 et seq., the Illinois Insurance Claims Fraud Prevention Act.

221.    740 Ill. Comp. Stat. § 92/5(a) provides a civil cause of action against any person who commits the crime of insurance fraud.

222.    Pursuant to 720 Ill. Comp. Stat. § 5/46-1, a person commits the offense of insurance fraud when he or she:

> knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company ...

223.    Defendants violated 720 Ill. Comp. Stat. § 5/46-1(a) and committed insurance fraud in that from at least 2009, and continuing through the present, they have repeatedly, knowingly, and intentionally presented, or caused to be presented, false claims for payment in connection with varicose vein consultations and EVLT procedures purportedly provided.

224.    The private insurers, unaware of Defendants' fraudulent acts, paid many of the claims submitted to them in connection with the fraudulent acts alleged herein. Had they known of the Defendants' fraudulent acts, they would not have paid the claims.

225. As a result of Defendant's commission of the insurance fraud described herein, the State of Illinois and its citizens have been damaged in an amount in excess of millions of dollars, exclusive of interest.

**WHEREFORE**, Relator respectfully requests that this Court award the following damages to the following parties and against Defendants:

A.    that this Court enter judgment in his favor and against the Defendants;

B.    that this Court enter a temporary restraining order and thereafter, a permanent injunction pursuant to 740 Ill. Comp. Stat. § 92/5(b) to protect the public and prevent the dissipation of illegal proceeds;

C.    that this Court order that all proceeds of the fraud scheme described herein and received by the Defendants (including their successors and agents) be held in constructive trust for the benefit of the Relator; and

D.    that this Court award the following damages against the Defendants:

To the State of Illinois:

1.    Disgorgement of all monies received by the Defendants through the submission of false claims;

2.    Three times the amount of each false claim the Defendants submitted and caused to be submitted under a contract of insurance;

3.    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim the Defendants submitted or caused to be submitted;

4.    An award of reasonable attorneys' fees, incurred by the State;

5.    Prejudgment interest;

6.    All expenses and costs of this action;

To Relator:

1.    An amount not less than thirty percent (30%) of the proceeds of this action pursuant to 740 Ill. Comp. Stat. § 92/25;

2.    Reimbursement of all expenses Mr. Zverev incurred in connection with this action;

3.     An award of reasonable attorneys' fees;

4.     Prejudgment interest;

5.     All expenses and costs of this action; and

6.     Such further relief the Court deems just and proper.

## COUNT IX
## ILLINOIS WHISTLEBLOWER ACT 740 ILCS 174/1 et seq.

226.    Relator realleges and incorporates by reference the above paragraphs as though fully set forth herein.

227.    Mr. Zverev conducted in good faith an investigation into Defendants' fraudulent medical and billing practices.

228.    As a result of Mr. Zverev's actions, he was subjected to retaliation and termination by the Defendants.

229.    Such conduct was in violation of the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*

230.    Through Defendants' actions in violation of the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, Mr. Zverev has suffered damages including, but not limited to, loss of his job and income, loss of career opportunities, and humiliation.

**WHEREFORE**, Plaintiff respectfully requests that this Court award the following damages to the following parties and against Defendants:

1.     A declaration that Defendants violated the Illinois Whistleblower Act;

2.     An award of damages in the amount of Plaintiff's lost pay and future salary, supplemental compensation and benefits;

3.     An award of attorneys' fees, costs, and expenses pursuant to the Illinois Whistleblower Act, 740 ILCS 174/30; and

4.      An award for any other and further relief that the Court deems equitable, just and proper.

## **DEMAND FOR A JURY TRIAL**

Mr. Zverev demands a jury trial on all claims alleged herein.

Respectfully submitted,

/s/ Robin Potter
Attorneys for Plaintiff-Relator

Robin Potter, Esq.
POTTER BOLANOS
111 East Wacker Drive
Suite 2600
Chicago, Illinois  60601
(312) 861-1800
robin@potterlaw.org

Gerald Robinson, Esq.
Susan Coler, Esq.
Nathanial Smith, Esq.
Halunen Law
80 South 8th Street
IDS Center, Suite 1650
Minneapolis, MN 55402
(612) 605-4098
robinson@halunenlaw.com

Greg Condon, Esq.
Bill Leonard, Esq.
WANG, LEONARD &
CONDON
33 North LaSalle Street
Suite 2020
Chicago, Illinois 60602
312-782-1668
greg.wlc@gmail.com
bill.wlc@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of **PLAINTIFF'S THIRD AMENDED COMPLAINT (Proposed)** were served upon all parties by ECF notice on this 21st day of September, 2018.


<u>/s/ Robin Potter</u>